IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE MACKEY, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:21-cv-50283 |
| | ) | |
| CHEMTOOL INCORPORATED, *et al*., | ) | The Honorable Iain D. Johnston |
| | ) | The Honorable Lisa A. Jensen |
| Defendants. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HOLIAN INSULATION COMPANY, INC., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Stephanie Mackey, Nick Migliore, and Sara Henderson ("Named Plaintiffs" or "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as more fully defined below), by their undersigned counsel, bring this class action lawsuit against Defendants Chemtool Incorporated ("Chemtool") and The Lubrizol Corporation ("Lubrizol") for damages sustained as the result of a June 14, 2021 fire and explosions that occurred at Defendants' Rockton, Illinois chemical plant ("Rockton Plant" or "Plant"), and the "environmental nightmare"[1] created by the fire, explosions, and resulting massive toxic smoke and dust plume.

Chemtool and Lubrizol failed to take the most basic steps to prevent the June 14, 2021 oil leak and resulting fire and explosions, despite numerous close calls at the Plant in the previous

[1]David K. Li, *Fire at Illinois Chemical Plant Could Cause "Environmental Nightmare," Fire Chief Says*, NBC News (June 14, 2021), https://www.nbcnews.com/news/us-news/video-shows-flames-engulfing-chemical-plant-northern-illinois-n1270729.

years, and despite years of dire warnings from their own insurance carrier. In particular, and most egregiously, Defendants repeatedly disregarded annual written warnings from their insurer and others that the Plant needed an automatic sprinkler system and other safety measures to reduce or eliminate the risk of catastrophic fire. After at least seven years of written warnings from their insurer about the need for an automatic sprinkler system, and the consequences of failing to install one, Defendants had unmistakable actual knowledge of the specific hazards the Plant faced without such a system. Despite such actual knowledge, Defendants willfully chose not to install any such system at the Plant. The foreseeable result of Defendants' utter indifference and conscious disregard was the total destruction of the Plant, the evacuation of thousands of nearby residents, and damage to thousands of neighboring properties. As a result of the preventable fire, explosions, and toxic smoke and dust plume, Plaintiffs and the other Class Members suffered property damage, including but not limited to loss of use and enjoyment of their property; investigation, cleanup, and remediation of their property; diminution in the value of their property; and lost profits. No claims are asserted for personal injuries.

Defendants' negligence, recklessness, and willful and wanton conduct caused and continues to cause harm to Plaintiffs and the other Class Members. Plaintiffs make the following allegations upon personal knowledge as to Defendants' acts and/or omissions, upon information and belief, and upon Plaintiffs' attorneys' investigation as to all other matters:

## I. GENERAL ALLEGATIONS

### A. Parties

1. On June 14, 2021 and thereafter, Plaintiffs Stephanie Mackey and Nick Migliore owned and lived in the property located at 800 Watts Avenue in Rockton, Illinois. Their residence

is less than one mile from Defendants' Rockton, Illinois Production Center, which is located at 1165 Prairie Hill Road, Rockton, Illinois 61072.

2. On June 14, 2021 and thereafter, Plaintiff Sara Henderson resided at 211 Foxfire Place in Rockton, Illinois, with her husband and two young children. Her residence is approximately 1.6 miles from the Rockton Plant.

3. Defendant Chemtool Incorporated is a Delaware corporation engaged in the business of manufacturing fluids, lubricants, and greases including industrial cleaners, corrosion inhibitors, and metalworking fluids. At all relevant times, Chemtool operated the Rockton Plant. Chemtool's headquarters and principal place of business are located at 801 West Rockton Road, Rockton, Illinois 61072.

4. Chemtool is a subsidiary of Defendant The Lubrizol Corporation, an Ohio company whose principal office is located at 29400 Lakeland Blvd. in Wickliffe, Ohio 44092. Lubrizol is a global specialty chemical company which owns and during all relevant times operated the Rockton Plant.

**B. Jurisdiction and Venue**

5. Plaintiffs Mackey, Migliore, and Henderson are citizens of Illinois. All of the proposed Class Members are Illinois citizens.

6. Defendant Chemtool is a citizen of Illinois.

7. Defendant Lubrizol is a citizen of Ohio.

8. This is a civil class action in which the amount in controversy exceeds $5,000,000, and in which one defendant (Lubrizol) is a citizen of a state different from the Plaintiffs. As a result, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1332(d)(2)(A).[2]

[2] Plaintiffs Mackey, Migliore, and Henderson originally filed their claims against Chemtool and Lubrizol resulting from the June 14, 2021 fire in Winnebago County Circuit Court. Defendants removed both actions

9. The Rockton Plant is located in the Northern District of Illinois, and a substantial part of the events or omissions giving rise to the claim occurred in the District. As a result, venue is proper under 28 U.S.C. §1391(b)(2).

**C. Background Facts**

10. Chemtool has maintained a presence in northern Illinois since at least 1979.

11. Chemtool markets itself as "a premium manufacturer of lubricants and grease products in the Americas" offering products "that are used in a multitude of markets and applications."[3]

12. In 2008, Chemtool built in whole or in part the Rockton Plant in the Village of Rockton, Illinois.

13. At all relevant times, Chemtool operated the Rockton Plant.

14. The Rockton Plant produced lubricants, grease products, and other fluids.

15. Chemtool and Lubrizol have a history of state and federal environmental violations.

---

to this Court. *See Mackey et al v. Chemtool et al*, No. 3:21-cv-50283 Dkt. 1; *Henderson v. Chemtool et al*, No. 3:21-cv-50285 Dkt. 1. Plaintiffs timely moved to remand both cases back to the Winnebago County Circuit Court. *See Mackey* Dkt. 25. This Court denied those motions on August 11, 2022. *See Mackey* Dkt. 85.

Plaintiffs filed their Consolidated Amended Complaint in compliance with the Court's April 11, 2023 Order (*Mackey* Dkt. 163). Although Plaintiffs' original complaints alleged jurisdiction and venue based on Illinois law, the Consolidated Amended Complaint and this Second Amended Consolidated Complaint set out federal subject-matter jurisdiction and venue in the U.S. District Court for the Northern District of Illinois. While Plaintiffs acknowledge that the basic elements of subject-matter jurisdiction under the Class Action Fairness Act ("CAFA") are met pursuant to 28 U.S.C. §1332(d)(2)(A), Plaintiffs preserve, and do not waive, their argument that their original actions fall under CAFA's "local controversy exception," 28 U.S.C. §1332(d)(4)(A), and that as a result their motions to remand should have been granted. *See Mackey* Dkt. 26, 35.

[3] https://www.chemtool.com/

16. In 2009, McHenry County, Illinois health authorities sued Chemtool for polluting soil and wetlands surrounding its 58-acre headquarters with sewage and other contaminants.[4]

17. In 2019, the French subsidiary of Lubrizol was charged with pollution and failing to meet safety standards after an explosion and fire at its plant in Rouen, France.

18. The blaze at the Rouen plant began on September 26, 2019 and caused a fire and a toxic smoke and dust plume that persisted for several days, spreading across the region and leading to irreparable harm to local homes and businesses.[5]

19. The community of Rockton, Illinois has approximately 7,500 residents.

20. Numerous residential, commercial, and public properties are located within three miles of the Rockton Plant. These properties include without limitation:

(a) Homes, schools, commercial buildings and stores, churches, and athletic fields;

(b) Fatt Cat Café, located 0.4 miles from the Rockton Plant;

(c) Taylor Company, located 0.5 miles from the Rockton Plant;

(d) River Chapel, located 0.58 miles from the Rockton Plant;

(e) Rockton United Methodist Church Parsonage, located 0.6 miles from the Rockton Plant;

(f) Coral Cove Family Fun Center, located 0.82 miles from the Rockton Plant;

(g) Catch the Wave Swim Club, located 0.83 miles from the Rockton Plant;

(h) Hononegah Community High School, located 0.9 miles from the Rockton Plant;

(i) Old Stone Congregational Church, located 0.94 miles from the Rockton Plant;

---

[4] https://prev.dailyherald.com/story/?id=294766

[5] John Clark, *Lubrizol, Which Owns Rockton Chemtool Plant, Had Fire in France in 2019,* mystateline.com (June 17, 2021), https://www.mystateline.com/news/lubrizol-which-owns-rockton-chemtool-plant-had-similar-fire-in-france-in-2019/.

(j) World of Dreams Daycare, located 1.14 miles from the Rockton Plant;

(k) South Beloit High School, located 1.16 miles from the Rockton Plant;

(l) Whitman Post Elementary, located 1.16 miles from the Rockton Plant;

(m) St. Andrew Preschool, located 1.22 miles from the Rockton Plant;

(n) Rockton Grade School, located 1.26 miles from the Rockton Plant;

(o) Rockton Athletic Fields, located 1.55 miles from the Rockton Plant;

(p) Unitarian Universalist Congregation of Rock Valley, located 1.66 miles from the Rockton Plant;

(q) Riverview School, located 1.79 miles from the Rockton Plant;

(r) Swedish American Stateline Clinic, located 1.87 miles from the Rockton Plant;

(s) St. Peters Catholic School, located 1.96 miles from the Rockton Plant;

(t) Prince of Peace Church, located 2 miles from the Rockton Plant;

(u) Macktown Golf Course, located 2.09 miles from the Rockton Plant;

(v) Pearl Lake RV Resort, located 2.16 miles from the Rockton Plant;

(w) Blair's Farm & Fleet, located 2.23 miles from the Rockton Plant;

(x) ALDI, located 2.34 miles from the Rockton Plant;

(y) Gaston Elementary School, located 2.34 miles from the Rockton Plant;

(z) Walmart Supercenter, located 2.43 miles from the Rockton Plant;

(aa) Hackett Elementary School, located 2.55 miles from the Rockton Plant;

(bb) Stephen Mack Middle School, located 2.7 miles from the Rockton Plant; and

(cc) Beloit College, located 3 miles from the Rockton Plant.

21. Figure 1, below, depicts a three-mile radius around the Rockton Plant.

Figure 1

22. As of June 14, 2021, there were many thousands of individual combustible materials stored at the Rockton Plant in drums, totes, tanks, kettles, and other types of containers including lead, antifreeze, nitrogen, sulfuric acid, and other chemicals. Among these chemicals were numerous organic and organo-metal compounds, oils, greases, and lubricants. The quantity of chemicals and other flammable and combustible liquids stored at the Rockton Plant on June 14, 2021 exceeded one million gallons, corresponding to almost 13 million pounds.

23. At all relevant times, the risk of a chemical fire, explosions, and release of a toxic smoke and dust plume at the Rockton Plant was reasonably foreseeable to Defendants.

24. At all relevant times, it was reasonably foreseeable to Defendants that the risk of a chemical fire, explosions, and release of a toxic smoke and dust plume at the Rockton Plant could impact the properties of, and present a hazard to, Plaintiffs and the Class Members.

**D. The Explosion and the Ensuing "Environmental Nightmare"**

25. On June 14, 2021, a fire and explosions occurred at the Rockton Plant, resulting in a massive toxic smoke and dust plume. The plume was so large that it was detected by weather satellites and could be observed 56 miles away from the Rockton Plant.

26. Figures 2, 3, 4, and 5, below, depict the smoke and dust plume.



Figure 2



Figure 3



Figure 4



Figure 5

27. The severity of the disaster was accurately captured by drone footage available at https://www.youtube.com/watch?v=rX6zCDkMSRY.

28. Nearly 90 fire departments and associated personnel and equipment were dispatched to the scene to assist in responding to the massive, six-alarm fire.

29. Defendants had not informed and did not inform the emergency responders of the type and amount of chemicals that were contained within the Rockton Plant.

30. Defendants had not consulted and did not consult with emergency responders to develop an emergency response plan to extinguish a fire at the Rockton Plant without causing significant environmental damage to Class Members' properties.

31. As a result of Defendants' failure to plan for such an emergency, the emergency responders were not equipped with proper fire suppression systems and equipment to extinguish the fire.

32. As a result of Defendants' failure to develop an appropriate emergency response plan, firefighting authorities were forced to allow the materials at the Rockton Plant to burn.

33. An Emissions Estimate Report prepared for Defendants by EHS Support estimates that the fire consumed more than 15 million pounds of product. Although all these chemicals and other materials were consumed by the fire, not all of them burned cleanly or with enough oxygen to ensure complete combustion. As a result, many millions of pounds of toxic and hazardous products of partial combustion, including carcinogenic polycyclic aromatic hydrocarbons (PAHs), were emitted into Class Plaintiffs' breathable ambient air and deposited on Class Plaintiffs' properties. Chemicals such as PAHs are persistent in the environment and could cause a range of adverse health impacts.

34. The fire at the Rockton Plant continued to burn through June 23, 2021, when it was officially declared extinguished. Even after June 23, 2021, the Plant continued to be a source of odor and pollutants including particulate matter, ash, dust, and other contaminants.

35. Authorities in Winnebago County, Illinois issued an executive proclamation of disaster emergency in response to the fire, explosions, and resulting toxic smoke and dust plume and ordered residents within a one-mile radius of the Rockton Plant to evacuate ("Evacuation Order").

36. The Evacuation Order displaced residents from more than 150 homes.

37. During the period of evacuation, evacuated residents were unable to return to their homes to obtain personal items and necessities, including medication, technology, and communication devices to inform loved ones of their wellbeing.

38. Winnebago County, Illinois authorities advised residents within a three-mile radius of the Rockton Plant to wear masks to protect against inhalation of potentially toxic and harmful chemicals and to remain indoors.

39. Winnebago County, Illinois authorities advised residents not to use HVAC systems.

40. The Evacuation Order was lifted on the morning of June 18, 2021, but Winnebago County, Illinois authorities advised that "Residents should take precautions upon returning home as their environment has been impacted by the fire,"[6] and directed residents to review a Guidance document entitled "Returning Home After a Chemical Fire" that was prepared by the Illinois Environmental Protection Agency, the Illinois Department of Public Health, and the Illinois Emergency Management Agency.

41. Among other things, that Guidance told residents:

- "Do not let children play in or with items covered by the ash or debris."
- "While outside playing or working in the yard, avoid hand to mouth contact and wash hands upon returning indoors."
- "When mowing wear respiratory protection."
- "When performing activities that may disturb ash or debris, wear respiratory protection."
- "Do not let pets drink water from puddles, or drink water or eat food that was outside during the incident."
- "Take off your shoes so that you do not track particles into your home."
- "When cleaning [air conditioner] filters wear a mask and gloves."
- "If you have a window air conditioner, close the outdoor air damper."
- "Clean interior floors and upholstery with high efficiency particulate air (HEPA-filter) vacuum cleaners."

42. The fire and explosions deposited various debris on property as far as fifteen miles from the Rockton Plant.

43. Winnebago County, Illinois authorities advised residents not to touch any of the debris that was deposited onto their properties "due to the potential [of] contaminated or hazardous

[6] *See* https://www.wchd.org/fire.

materials,"[7] but to have it removed by professionals experienced in working with hazardous materials.

44. Winnebago County, Illinois authorities cautioned residents against using their lawn mowers due to concerns about the composition of particulates that settled on residents' properties.

45. Although Defendants hired a contractor to respond to requests for removal of large items of debris, this removal effort was wholly inadequate to remedy the harms to the properties of Plaintiffs and other Class Members, as the contractor was only authorized to remove large items of debris, and the contractor stepped on smaller items of debris to force them into the ground.

46. Class Members resorted to using magnetic rollers of the kind used to pick up nails at construction sites to try and remove metallic flakes from their properties.

47. Months after the fire was declared extinguished, Class Members continued to experience nauseating odors at their properties.

48. Illinois Governor J.B. Pritzker activated personnel from numerous state agencies and departments, including the Illinois Emergency Management Association, State Police, the Illinois National Guard, and the Illinois Department of Public Health, to participate in the response to the fire.

49. Governor Pritzker activated the State Emergency Operation Center to help coordinate the response to the fire.

50. The Illinois Department of Transportation, the Illinois Environmental Protection Agency, the State Fire Marshal's Office, the American Red Cross, and the Salvation Army were also mobilized to assist in the response.

[7] *See id*.

51. Officials from the U.S. Environmental Protection Agency, the U.S. Department of Health and Human Services, and the Federal Emergency Management Agency also provided support to the response.[8]

52. On June 16, 2021, officials from the Illinois Environmental Protection Agency requested that the Illinois Attorney General take legal action against Chemtool to stop the release of pollutants from the chemical fire, including sulfuric acid, particulate matter, and other airborne contaminants.

53. On July 9, 2021, the Illinois Attorney General and the State's Attorney of Winnebago County filed a complaint in the Circuit Court of the Seventeenth Judicial Circuit, Winnebago County, Chancery Division, seeking preliminary injunctive relief to enjoin Chemtool from creating any further substantial endangerment to the environment and public health and welfare and from committing any further violations of the Illinois Environmental Protection Act resulting from the June 14, 2021 fire. *People of the State of Illinois, ex rel. Kwame Raoul, et al. v. Chemtool, Inc.*, No. 2021-CH-115.

54. On April 25, 2022, the court in the aforementioned case entered an Agreed Immediate and Preliminary Injunction Order that had been signed by the Illinois Attorney General, the Winnebago County State's Attorney, and Chemtool ("Preliminary Injunction"). Among other things, the Preliminary Injunction ordered Chemtool to: (a) "take all necessary actions to prevent the further discharge or release of wastewater, petroleum products, oils, chemicals, and other contaminants, as a result of the Fire, from the Site onto the land, air, sediment, surface water, and/or groundwater," (b) submit to the Plaintiff, for its review and approval, and thereafter

[8] According to the U.S. Environmental Protection Agency, a private company hired by Defendants was brought in to assist with extinguishing the massive chemical fire.

implement, a "Site Investigation Work Plan" for the investigation of all on- and off-Site impacts that may have been impacted by the fire; (c) reimburse the Illinois Environmental Protection Agency "for all reasonable and necessary past and future costs incurred by the Illinois EPA" in connection with its response to the Fire; (d) "reimburse the Illinois Emergency Management Agency for all reasonable response, oversight and review costs that it may incur relating to the Fire"; and (e) "reimburse Winnebago County for all reasonable response and oversight costs it incurred as a result of the Fire."

### E. Defendants Had Actual Knowledge of the Risk of Fire and Recklessly Failed to Take Basic Precautions to Mitigate that Risk, including by Consciously Disregarding Recommendations to Install an Automatic Sprinkler System

55. Day-in and day-out, the Rockton Plant manufactured greases, lubricants, additives, and other chemical fluids, handling thousands of toxic and highly flammable chemicals. In the grease manufacturing area of the Plant, Defendants cooked greases in large steel kettles heated by pressurized hot oil, which circulated in a piping network throughout the plant and around the kettles at over 500 degrees Fahrenheit.

56. In the months leading up to the June 14, 2021 fire, Defendants engaged Holian Insulation Company, Inc. ("Holian"), an outside contractor, to replace the insulation on the hot oil piping network in the Plant's grease manufacturing area. This work had been recommended annually by Defendants' insurer, FM Global, since at least 2014 because the existing insulation was a fire hazard.

57. On the morning of June 14, 2021, a pressure tap on a pressurized hot oil return pipe in the area of the Plant where Holian was performing insulation replacement work began leaking and spraying hot oil. The hot oil ignited several minutes later. Defendants have alleged that Holian

negligently operated a scissor left, causing it to damage the pressure tap and create the leak and spraying of the pressurized hot oil.

58. June 14, 2021 was not the first time the Plant experienced a hot oil leak nor the first time that such a leak resulted in a fire. Several years earlier, on July 1, 2016, the Rockton Police Department ("RPD") and Rockton Fire Protection District ("RFPD") responded to a fire caused by a leak of hot oil at the Plant, which required 500 gallons of water to extinguish. On July 11, 2017, hot oil again leaked at the Plant, this time when an employee attempted to change a valve.

59. Notwithstanding the highly toxic and flammable materials stored and processed in the Plant and Defendants' knowledge of the risk of fire and damages to the Class Plaintiffs' properties, Defendants failed to exercise reasonable care to prevent these damages. In particular, Defendants failed to take basic precautions and engage in basic preparation and planning that would have: (1) prevented the leaking and spraying of pressurized hot oil in the first place, (2) prevented ignition of the pressurized hot oil once the leaking and spraying began, and (3) prevented the pressurized hot oil from continuing to burn for days after it was ignited, resulting in the total destruction of the Plant and harm to the surrounding community including Plaintiffs and the Class.

***Defendants' conscious choice to disregard annual warnings to install automatic sprinklers***

60. Most troublingly, Defendants consciously disregarded annual warnings about the need to install an automatic sprinkler system in the area of the Plant where the fire began, despite their specific knowledge that the lack of such sprinklers could lead to the total destruction of the Plant by a fire. An August 31, 2020 document produced by Defendants acknowledges that "[t]he current fire protection system covers office areas but has no coverage in raw material, production, packaging, or warehouse areas."

61. Every year from 2015 to 2020, Nelson Fire Protection (a fire safety contractor hired by Defendants) conducted an annual fire safety inspection of the Plant and provided Defendants with a written inspection report. Each of those inspection reports noted that the Plant was not "completely sprinklered" and contained the same recommendation: "<u>Sprinkler rest of building.</u>" The relevant portion of the 2015 inspection report is shown below:

| 1. GENERAL | YES | N.A.+ | NO* |
|---|---|---|---|
| a. Is the building occupied according to information furnished by owner or owner's representative? | X | | |
| b. Is occupancy same as previous inspection according to information furnished by owner or owner's representative? | X | | |
| c. Are all systems in service? | X | | |
| d. Are all fire protection systems same as last inspection according to information furnished by owner or owner's representative? | X | | |
| e. Is building completely sprinklered? | | | X |

22. Desirable improvements. *Sprinkler rest of building*

62. Similarly, FM Global, Defendants' property insurance carrier and an industrial risk expert, inspected the Plant annually during site visits beginning in 2014. In each resulting written report ("Risk Report"), FM Global presciently warned that:

> The most significant Facility Hazard is the lack of sprinkler protection in the production and warehouse areas where significant combustible materials and ignitable liquids are present. This could lead to a serious fire that could spread throughout the facility.

FM Global further advised Defendants that:

> Developed over 100 yr. ago, automatic sprinkler and water spray protection is the most reliable and effective means of controlling fires in industrial and commercial properties such as this.

And each year from 2014 and 2020, FM Global warned Defendants that a failure to implement its fire safety recommendations, including the installation of automatic sprinklers, could result in Maximum Foreseeable Loss (*i.e.*, total destruction of the Plant). An excerpt from FM Global's 2015 Risk Report provided to Defendants is shown below:

**14-07-006** **Provide adequate automatic sprinkler protection throughout the plant.**

**Part B.** **Provide adequate automatic sprinkler protection throughout the production areas.**

Adequate automatic sprinkler protection should be provided for the production areas designed in accordance with FM Global guidelines and should include both roof-level protection, under tank protection, and under mezzanine protection, all balanced together. If this is pursued, contact FM Global for assistance.

| | | |
|---|---|---|
| **Loss Expectancies (USD)** | Exposure to Loss is approximately: | Redacted PD<br>Redacted BI<br>(About 548 days) |
| | Exposure to Loss if Completed is approximately: | Redacted PD<br>Redacted BI<br>(About 3 days) |
| | Cost Estimate: | Redacted |
| **Risk*Mark* Points** | Completion of only this recommendation will result in a Risk*Mark* score increase of less than one point. Completing this recommendation along with other risk improvement efforts can result in more significant improvements to the Risk*Mark* score. | |
| **Status** | According to Mr. Jim Ganger, there are no current plans to complete the recommendation. | |

**Part C.** **Provide automatic sprinkler protection throughout the warehouse areas.**

Adequate automatic sprinkler protection should be provided throughout the warehouse areas of the facility in accordance with FM Global guidelines. This will require the use of storage-type automatic sprinklers as well as in-rack sprinkler protection in some cases. FM Global should be contact for guidance if this protection is pursued.

| | | |
|---|---|---|
| **Loss Expectancies (USD)** | Exposure to Loss is approximately: | Redacted PD<br>Redacted BI<br>(About 548 days) |
| | Exposure to Loss if Completed is approximately: | Redacted PD<br>Redacted BI<br>(About 3 days) |
| | Cost Estimate: | Redacted |

**14-07-006C continued**

| | |
|---|---|
| **Risk*Mark* Points** | Completion of only this recommendation will result in a Risk*Mark* score increase of less than one point. Completing this recommendation along with other risk improvement efforts can result in more significant improvements to the Risk*Mark* score. |
| **Status** | According to Mr. Jim Ganger, there are no current plans to complete the recommendation. |

63. Nelson Fire Protection and FM Global were not the only expert companies that warned Defendants of the need to install automatic sprinklers throughout the Plant and that warned Defendants of the risks resulting from a failure to do so. Paratherm, the manufacturer of the

pressurized hot oil that ignited and started the fire, and a division of Lubrizol, published an article written by one of its fire safety experts, discussing fire safety precautions for hot oil systems. In the article, titled *Bolstering Fire Safety*, Paratherm warns of the need for sprinklers when operating a hot oil system precisely like the one at the Rockton Plant, stating: "[a]utomated sprinkler systems are recommended for release at critical areas throughout the system, such as at the heat source, in control rooms, and around relief discharges and process users."

64. Moreover, in late 2017, the Dow Chemical Company conducted an audit of the Rockton Plant and reported to Defendants that "Chemtool Inc. stores and handles flammable raw materials in drum quantities without adequate fire protection systems in place, and without the use of dip-pipes to limit static and vapor generation" and that "Chemtool Inc. should benefit from implementing appropriate fire protection systems in areas where flammable materials are stored." Defendants' internal correspondence regarding this report was that "[w]hile this action is cost prohibitive for the plant as a whole, fire protection systems are being evaluated and will be installed where applicable." However, Defendants never installed such fire protection systems.

65. Furthermore, Defendants were aware that the Plant's fire suppression system did not meet fire code requirements. An internal company PowerPoint dated September 15, 2020 stated that the system "does not meet FM Global recommendations or fire code requirements for manufacturing, packaging, and warehouse areas":




Rockton North Fire Protection

## Project Justification

- Current Rockton North fire suppression system does not meet FM Global recommendations or fire code requirements for manufacturing, packaging, and warehouse areas
  - Current system only covers core office area
- Continuing without a fire suppression system increases risk for property and personnel damage in case of a fire
  - Possible risk up to and including total facility/property loss, significant business interruption, and loss of life
- Bid package to be developed will allow for competitive FEL-3 bids from multiple contractors

Lubrizol

© The Lubrizol Corporation. All rights reserved. 4

CHEM-0023750

66. During depositions in this case, a Plant employee testified that he thought sprinklers "should have been in [the Rockton Facility] to begin with" and he "questioned why they didn't" already install sprinklers. Another Plant employee agreed that if Defendants had been "told by numerous sources for years prior to the fire that a water suppression system that fully covered the production and grease area would greatly minimize any damage from a large-scale fire," then Defendants should have installed sprinklers and that he did not know "why that would not have happened."

67. Keith Dooley, who was the Plant Manager on the day of the fire, also testified in his deposition that automatic sprinklers would protect the facility and the community from a catastrophic event like that which occurred at the Plant:

> Q. The reason to put the sprinklers in was twofold. I assume one was to protect the plant in case there was a fire, correct?
> A. Correct.
> Q. Another was to protect the workers in case there was a fire, correct?
> A. Correct.
> Q. Another was to protect the community in case there was a fire, correct?

A. It was to prevent any fire.
Q. To protect the community in part, correct?
A. Yes. Yes.

68. Despite these repeated warnings, over years from numerous fire safety experts, and in both utter indifference to and conscious disregard for the safety of the Plant and the surrounding community including Plaintiffs and the Class, Defendants recklessly chose to operate the Plant without an automatic sprinkler system. The June 14, 2021 fire and resulting harm to Plaintiffs and the Class were a foreseeable consequence of Defendants' failure to install an automatic sprinkler system.

***Defendants' conscious disregard of repeated warnings to replace improper insulation***

69. FM Global not only warned Defendants to install an automated sprinkler system through the Plant, but it also warned Defendants that they needed to replace insulation in critical areas throughout the Plant, including around the hot oil piping system. An excerpt from FM Global's 2015 Risk Report provided to Defendants is shown below. FM Global provided identical warnings and recommendations annually:

14-07-003
Target

**Replace the glass fiber insulation on process vessels and piping with foamed glass.**

The existing glass fiber insulation with a metal lath and plaster cover on the process vessels should be replaced with foamed glass or similar type non-wicking insulation. The glass fiber insulation with metallic shielding should also be replaced on the plant piping that handles heat transfer fluid, process liquid or raw material (it can be used on steam, chiller and cooling water piping, but not within 3 ft. of vessels, pumps or end use points). The order of importance should be vessels, piping within 3 ft. of flanges and pumps, and then the remaining pipe as funding permits.

| | |
|---|---|
| **The Hazard** | Glass fiber insulation is a wicking type insulation that can allow leaks of process material to get trapped in. Once the material from a spill or leak gets inside the insulation, it can carbonize, which lowers the flash point of the material over time to the point that hot surfaces can ignite it. Although these fires initially tend to be small, over years of leaks and releases, the amount of material increases causing the potential fire to become larger, eventually getting to the point that it becomes a well-developed, shielded fire that can grow beyond incipient stages by the time the fire department can begin manual firefighting efforts. |

70. In *Bolstering Fire Safety*, Paratherm explains the hazard created by wicking insulation and the importance of using non-wicking insulation:

> It is well understood that a combustible fluid can ignite at temperatures below its published autoignition temperature, if spread in a thin film. The high surface area present in many types of insulation can promote this phenomenon when soaked with a thermal fluid. Open cell insulation, such as mineral fibre, can wick, leaking heat transfer fluid into its porous structure. The wicked fluid proceeds to oxidise, which can raise the temperature of the insulation above the fluid's autoignition temperature.
>
> Foamed glass insulation is the standard recommended insulating material because it cannot absorb oil. Leaked oil will pool following the path of least resistance. Weep holes are sometimes drilled through the insulation to prevent excessive accumulation. Mineral wool or fibreglass insulation can be safely used on horizontal pipe runs where the potential for a leak is negligible. It is wise to consider installing a metal drip ring to separate the fibrous material from the closed-cell insulation. It is also recommended that the insulation be covered with aluminum cladding to protect from external hazards, and that the use of insulating flanges is avoided wherever possible, as they are potential leak points. If fluid-soaked insulation is discovered, it should be addressed with haste and caution. Cladding and soaked insulation must be removed very carefully and slowly, preferably with the system cooled down.

71. Despite these repeated warnings, and in both utter indifference to and conscious disregard for the safety of the Plant and the surrounding community including Plaintiffs and the Class, Defendants recklessly chose to operate the hot oil system with the improper type of insulation. The June 14, 2021 fire and resulting harm to Plaintiffs and the Class were a foreseeable consequence of Defendants' failure to operate the hot oil system with the proper insulation.

***<u>Defendants' conscious disregard of recommendations to install automatic shutoffs in the hot oil system</u>***

72. Defendants also failed to install automatic shutoffs that could have mitigated the risk that a leak of pressurized hot oil would result in a catastrophic fire. FM Global warned Defendants that, "[t]he lack of automatic shutoffs for the pumping systems for the base oils and the [heat transfer fluid] system could lead to an [ignitable liquid] being continuously supplied to a

potential fire area." Paratherm echoed this warning, stating that, "fuel shut-off valves can go a long way in preventing a catastrophe."

73. Despite these repeated warnings, and in both utter indifference to and conscious disregard for the safety of the Plant and the surrounding community including Plaintiffs and the Class, Defendants recklessly chose to operate the pressurized hot oil system without automatic shutoffs. The June 14, 2021 fire and resulting harm to Plaintiffs and the Class were a foreseeable consequence of Defendants' failure to install automatic shutoffs in the hot oil system.

***Defendants' reckless failure to stop the flow of hot oil during Holian's repair work***

74. Defendants could have shut off the flow of pressurized hot oil and drained the pipes on which Holian was working on June 14, 2021, prior to allowing Holian to perform work on the pressurized hot oil piping system. This would have eliminated the risk of a hot oil leak and resulting fire. Plant employees have testified in this case that stopping the flow of and draining the hot oil from piping to and from a particular kettle would have taken mere minutes. Further, Plant employees testified that the reactor kettles in the grease manufacturing area were typically not all in simultaneous use due to maintenance or other issues. Accordingly, Defendants could have drained hot oil from discrete sections of the piping system where contractors were working without disrupting production.

75. Plant employees believed it would have been safer for the outside contractors to perform work on the piping if there was no pressurized hot oil flowing through it. One employee stated "it would be a lot safer if the oil was not in [the hot oil piping]" while outside contractors were working on the pipes. Another testified that it was his "understanding that it would be safer to work on [the hot oil] lines if they were not filled with hot oil and not pressurized." Moreover, Defendants' Lockout/Tagout Policy specifically provided that "[t]he isolation of all equipment is

required when a person may be exposed to danger from the release of chemicals or energy when maintaining or servicing such equipment." That Policy defined "equipment" to include "any pipeline . . . into which or through which chemicals, materials and/or energy may pass" and defined "isolation" as "[t]he creation of barriers which prevent the flow of any energy or materials from one side of the barrier to the other side." That Policy also provides that "[i]n preparation for maintenance or servicing activities, the equipment owner and maintenance department shall . . . Ensure the equipment has been properly . . . purged, flushed and drained." (emphasis added).

76. In both utter indifference to and conscious disregard for the safety of the Plant and the surrounding community, including Plaintiffs and the Class, Defendants recklessly chose to allow the flow of pressurized hot oil into the piping where Holian was performing its insulation replacement work, in violation of its own Lockout/Tagout Policy. The June 14, 2021 fire and resulting harm to Plaintiffs and the Class were a foreseeable consequence of Defendants' violation of its own Lockout/Tagout Policy, their failure to shut off the flow of pressurized hot oil, and their failure to drain the pipes of such oil prior to Holian commencing its insulation replacement work.

***Defendants' reckless failure to supervise Holian***

77. FM Global also warned Defendants that they should properly supervise outside contractors like Holian. Specifically, FM Global wrote: "Facility personnel should closely supervise all contractors involved in this project whenever present in the facility. Contractors should be advised of all regulations on smoking, hot work, flammable liquid handling and housekeeping before the start of any work."

78. Defendants were on notice of the risk that while operating a scissor lift to perform its insulation replacement work, Holian could cause a leak of pressurized hot oil. On at least two

prior occasions, December 6, 2017 and January 17, 2020, fork lifts hit and triggered fire alarm pull stations in the Rockton Plant.

79. Despite FM Global's warning and notice of the risk that Holian's operation of a scissor lift could cause a leak of pressurized hot oil, and in both utter indifference to and conscious disregard for the safety of the Plant and the surrounding community including Plaintiffs and the Class, Defendants recklessly failed to supervise Holian's insulation replacement work in the Plant on June 14, 2021. The leak of pressurized hot oil, ignition of the hot oil, fire, and resulting harm to Plaintiffs and the Class were a foreseeable consequence of Defendants' failure to supervise Holian's insulation replacement work.

### F. Community Impacts from the Rockton Plant Fire and Explosion

80. Beginning on June 14, 2021 and continuing through the date of this Second Amended Consolidated Complaint, Plaintiffs and the Class Members have been unable to use and enjoy their indoor and outdoor property as a result of the debris and poor air quality caused by the fire, explosions, and toxic smoke and dust plume.

81. Rockton residents, as well as residents of neighboring towns, have reported that the debris, smoke, dust, and air quality resulting from the fire, explosions, and toxic smoke and dust plume have caused nuisance-level physiological harms, including respiratory difficulty, offensive smells, nausea, and headaches, which have further impaired their ability to use and enjoy their properties.

82. The Illinois Environmental Protection Agency took wipe samples at locations close to the Rockton Plant on June 17, 2021 and the publicly available results demonstrate that several

chemical analytes were detected above the reporting limit, including aluminum, barium, boron, calcium, chromium, iron, magnesium, manganese, potassium, strontium, and zinc.[9]

83. At the time of the fire and explosions, Plaintiffs Mackey and Migliore were at their home at 800 Watts Avenue in Rockton, Illinois. Plaintiffs Mackey and Migliore evacuated their home on June 14, 2021 pursuant to the mandatory evacuation order.

84. At the time of the fire and explosions, Plaintiff Henderson was at her home at 211 Foxfire Place in Rockton, Illinois. She and her family evacuated their home on June 14, 2021 and did not fully return until June 21, 2021.

85. As a result of the fire, explosions, and resulting toxic smoke and dust plume, toxic and harmful substances, smoke, debris, particulate matter, other dust, and other pollutants have been deposited in, on, and around Plaintiffs' properties.

86. As a result of the fire, explosions, and resulting toxic smoke and dust plume, Plaintiffs and the Class Members had and continue to have concerns about their own wellbeing and the wellbeing of their families because their residences were directly impacted by the plume, which has further interfered with their ability to use and enjoy their properties.

87. Plaintiffs and the Class Members and their families have not been able to use and enjoy their homes and properties as expected.

88. At all relevant times, Defendants failed to exercise reasonable care and acted with utter indifference to and conscious disregard for the safety of Plaintiffs and the Class Members.

89. Defendants failed to prevent the fire, explosions, and the resulting toxic smoke and dust plume and otherwise failed to exercise reasonable care and acted with utter indifference to and conscious disregard for the safety of Plaintiffs and the Class Members.

---

[9] https://www2.illinois.gov/epa/topics/community-relations/sites/Chemtool/Documents/ILEPA%20Wipe%20Samples%2021F0726%20Chemtool.pdf.

90. Defendants failed to discover the hazards that resulted in the fire, explosions, and resulting toxic smoke and dust plume, where such hazards could have been discovered by the exercise of ordinary care.

91. Defendants failed to exercise reasonable care to take sufficient precautions which would have prevented or mitigated the fire, explosions, and resulting toxic smoke and dust plume and acted with utter indifference to and conscious disregard for the safety of Plaintiffs and the Class Members.

92. Defendants failed to act with reasonable or ordinary care to prevent toxic chemicals, dust, and hazardous by-products from being released into the environment and onto the properties of Plaintiffs and the other Class Members and acted with utter indifference to and conscious disregard for the safety of Plaintiffs and the Class Members.

93. Defendants failed to act with reasonable or ordinary care to contain the discharge of toxic smoke, dust, and hazardous by-products after the fire and explosions occurred and otherwise acted with utter indifference to and conscious disregard for the safety of Plaintiffs and the Class Members.

94. At all relevant times, it was foreseeable to Defendants that their failures would seriously injure Plaintiffs and the other Class Members.

### G. CLASS ACTION ALLEGATIONS[10]

95. Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to certify and represent a class defined as:

> All current Illinois citizens who were, on June 14, 2021, owners or tenants of property located in Illinois within a three-mile radius of the Rockton Plant.

[10] As stated *supra* n.2, Plaintiffs originally filed their complaints against Chemtool and Lubrizol in Winnebago County Circuit Court, citing Illinois Code of Civil Procedure 735 ILCS 5/2-801 with regard to their class action allegations. In this Second Amended Consolidated Complaint, Plaintiffs cite Fed. R. Civ. P. 23 for those allegations. Plaintiffs' arguments for class certification pursuant to Fed. R. Civ. P. 23 as to

96. Specifically excluded from the Class are Defendants, including any parent, subsidiary, affiliate, or controlled person of Defendants; Defendants' officers, directors, agents, or employees, the judicial officers assigned to this litigation and any members of their staff and immediate family, and any juror assigned to this action.

97. Plaintiffs reserve the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

98. **Numerosity.** Upon information and belief, there are hundreds of members of the Class, making the members of the Class so numerous that joinder of all members is impracticable. Although the exact number of members of the Class is currently unknown to Plaintiffs, thousands of people live in Rockton alone and thousands of pieces of property were affected. Class Members may be identified through objective means, including objective data available to the Parties regarding the persons and property present in the affected areas following the explosion and fire. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media and/or published notice. Thus, pursuant to Fed. R. Civ. P. 23(a)(1), the large size of the Class renders the Class so numerous that joinder of all individual members is impracticable.

99. **Predominance of Common Questions of Law or Fact.** The claims and defenses in this case present numerous common questions of law and fact, which predominate over any questions affecting only individual Class Members. Common questions include, but are not limited to the following:

(a) Whether Defendants engaged in the wrongful conduct alleged herein;

---

Lubrizol are set out in more detail in their Motion for Class Certification filed on April 3, 2023. *See Mackey* Dkt. 151. Plaintiffs do not waive their class allegations pursuant to 735 ILCS 5/2-801.

(b) Whether Defendants caused the release of toxic particulate matter into the Rockton community resulting from the fire at the Rockton Plant;

(c) Whether Defendants failed to use the appropriate standard of care in allowing the fire at the Rockton Plant to occur;

(d) Whether Defendants failed to use the appropriate standard of care in failing to contain and suppress the fire at the Rockton Plant once it occurred;

(e) Whether Defendants omitted required, reasonable, or minimal safety measures resulting in the fire at the Rockton Plant;

(f) Whether Defendants failed to follow required, reasonable, or minimal safety measures that would have mitigated the fire at the Rockton Plant;

(g) Whether Defendants engaged in ultrahazardous activities;

(h) Whether Defendants were negligent;

(i) Whether Defendants created a nuisance;

(j) Whether Defendants trespassed on Class Members' properties;

(k) Whether Plaintiffs and the other Class Members suffered injury and damages as a result of Defendants' conduct; and

(l) Whether Plaintiffs and the other Class Members are entitled to damages, equitable relief, and other relief.

100. Plaintiffs share a common interest with the other Class Members in the objectives of the action and the relief sought.

101. Plaintiffs' claims satisfy the commonality requirement of Fed. R. Civ. P. 23(a)(2) and the predominance requirement of Fed. R. Civ. P. 23(b)(3), because they arise from Defendants' course of conduct which led to the single incident affecting all of the Class Members and are based on the same legal theories as all other Class Members' claims.

102. **Adequacy and Typicality.** Pursuant to Fed. R. Civ. P. 23(a)(4), Plaintiffs can and will adequately represent the other Class Members and their interests are common to and coincident with them. By proving their individual claims, Plaintiffs will necessarily prove the other

Class Members' claims and prove Defendants' class-wide liability. Plaintiffs have no known conflicts of interest with any of the other Class Members, their interests and claims are not antagonistic to those of any other Class Member, nor are their claims subject to any unique defenses.

103. Moreover, pursuant to Fed. R. Civ. P. 23(a)(3), Plaintiffs' claims are typical of the claims of all other Class Members because all such claims arise from Defendants' conduct as alleged herein.

104. Plaintiffs and the other Class Members' legal claims arise from the same single event, namely, the Rockton Plant fire, followed by a series of explosions emitting debris and a toxic smoke and dust plume throughout the Rockton, Illinois area and beyond. The material facts underlying each Class Member's claim are the same material facts as those supporting Plaintiffs' claims alleged herein and require proof of the same material facts.

105. Plaintiffs, therefore, can and will fairly and adequately protect and represent the other Class Members' interests.

106. Plaintiffs' counsel—Foote, Mielke, Chavez & O'Neil, LLC, WilliamsMcCarthy LLP, Miner, Barnhill & Galland, P.C., The Collins Firm, DiCello Levitt Gutzler LLP, Hart McLaughlin & Eldridge, LLC, and Romanucci & Blandin, LLC—have extensive experience in environmental and toxic tort litigation and class actions, and have sufficient personnel and adequate financial resources to ensure that the interests of the Class will be adequately represented.

107. If appointed Class representatives, Plaintiffs are aware of, and are committed to, faithfully upholding their fiduciary duties to absent Class Members.

108. Plaintiffs and their counsel are committed to the vigorous prosecution of this action and will allocate the appropriate time and resources to ensure that the Class is fairly represented.

109. Plaintiffs and their counsel will, therefore, fairly and adequately assert and protect the interests of the Class.

110. **Superiority of the Class Action to Other Available Methods**. A class action is superior to any other method for fairly and efficiently adjudicating the controversy, as required by Fed. R. Civ. P. 23(b)(3). For the vast majority of the thousands of class-area households, the costs and burdens of prosecuting their own lawsuits would be prohibitive. Class treatment of this controversy will be cost-efficient for the parties and the Court, and will promote uniformity of decision. The manageability challenges presented in this class action will be simpler than the challenge of litigating each household's claim individually.

## H. CLAIMS ALLEGED

### COUNT I
### Negligence
### (Against Chemtool and Lubrizol)

111. Plaintiffs adopt and incorporate all prior paragraphs, as though fully set forth herein.

112. Defendants knew or should have known of the risk of fire and explosion at the Rockton Plant.

113. Defendants knew of the risk that pressurized hot oil could leak from the hot oil piping system and kettles at the Rockton Plant and ignite to cause a fire;

114. Defendants knew or should have known of the risk that a fire and explosion at the Rockton Plant would result in the release of toxic substances into the surrounding neighborhood.

115. Defendants knew or should have known of the risk that a fire and explosion at the Rockton Plant would result in the release of toxic and harmful dust, particulate matter, smoke, debris and pollutants into the surrounding neighborhood.

116. Defendants knew or should have known that the release of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants would pose a risk of serious damage to, diminution in the value of, and loss of use and enjoyment of the affected property.

117. Defendants had a duty to Plaintiffs and the other Class Members to exercise reasonable care to prevent the foreseeable interference with Class Members' use and enjoyment of their properties that has resulted from the release of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants from the fire, explosion, and resulting smoke and dust plume.

118. Defendants had a duty to prevent the release of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants from the Rockton Plant.

119. Defendants breached the duties that it owes to Plaintiffs and each of the other Class Members to exercise reasonable care, which has caused property damage, including but not limited to lost profits; loss of use and enjoyment of property; investigation, cleanup, and remediation of the property; and diminution of property value.

120. Specifically, Defendants breached that duty by, *inter alia*:

(a) Failing to take measures to identify and prevent the risk of fire and explosion at the Rockton Plant;

(b) Failing to inform emergency responders of the hazards associated with responding to a fire and explosion at the Rockton Plant;

(c) Failing to develop appropriate emergency response plans to minimize the catastrophic effect of a fire and explosion;

(d) Failing to prepare for and supervise properly the work of contractors at the Rockton Plant;

(e) Failing to take sufficient precautions to prevent pressurized hot oil from leaking from the piping system where contractors were working and igniting;

(f) Choosing not to take sufficient precautions to prevent a fire;

(g) Choosing not to take sufficient precautions to prevent an explosion;

(h) Choosing not to take sufficient precautions to suppress and/or extinguish a fire;

(i) Allowing enormous amounts of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants to be deposited on Class Members' properties;

(j) Otherwise failing to take sufficient precautions to control the emissions of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants from Class Members' property; and/or

(k) Other acts of negligence which may be discovered in the course of this litigation.

121. As a direct and proximate cause of one or more of the aforementioned negligent acts or omissions, Plaintiffs and the other Class Members have sustained, and continue to sustain, property damage.

122. As a direct and proximate cause of one or more of the aforementioned negligent acts or omissions, Plaintiffs and the other Class Members have incurred, and will continue to incur, monetary damages arising from the property damage, including but not limited to lost profits; loss of use and enjoyment of property; investigation, cleanup, and remediation of the property; and diminution of property value.

**COUNT II**
**Willful & Wanton Conduct**
**(Against Chemtool and Lubrizol)**

123. Plaintiffs adopt and incorporate all previous paragraphs, as though fully set forth herein.

124. Defendants acted with utter indifference and conscious disregard for the safety of Plaintiffs and the other Class Members in its negligent acts or omissions.

125. Defendants knew of the risk that pressurized hot oil could leak from piping at the Rockton Plant and ignite to cause a fire.

126. Defendants knew or should have known that failing to supervise contractors performing insulation replacement work on the Plant's hot-oil system could lead to damage, including a leak and ignition of pressurized hot oil and fire.

127. Defendants knew that allowing the pressurized flow of hot oil through the Plant's hot-oil piping while contractors performed insulation replacement work created an unreasonable risk and that cutting off the flow of hot oil to, and draining the hot oil from, the piping where such work was being performed would have eliminated the risk of a leak of hot oil from such piping.

128. Defendants knew that failure to install automatic shutoffs in the hot oil system could supply a fire with continuous fuel.

129. Defendants knew that the Plant's highly flammable insulation could contribute to the growth of a fire beyond incipient stages by the time the fire department could respond.

130. Defendants knew that failure to install an automatic sprinkler system could result in catastrophic damage, including the destruction of the entire Plant and harm to the surrounding community including Plaintiffs and the Class.

131. Defendants knew that a catastrophic fire and explosions would result in the release of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants.

132. Defendants consciously disregarded the risks of which they were aware, including the risks about which they had been informed repeatedly over the course of years prior to the fire.

133. Defendants willfully failed to take any action to reduce, eliminate, or otherwise address those risks.

134. Defendants were reckless by failing to inform emergency responders of the hazards associated with responding to the fire and explosion at the Rockton Plant.

135. Defendants were conscious of their reckless conduct and were conscious, from their knowledge of the surrounding circumstances and existing conditions, that their reckless conduct would naturally and foreseeably result in harm to the surrounding community, including Plaintiffs and the Class.

136. As a direct and proximate result of one or more of Defendants' aforementioned willful and wanton acts or omissions, Plaintiffs and the other Class Members have incurred, and will continue to incur, monetary damages arising from property damage, including but not limited to lost profits; loss of use and enjoyment of property; investigation, cleanup, and remediation of property; and diminution of property value.

## COUNT III
**Nuisance**
**(Against Chemtool and Lubrizol)**

137. Plaintiffs adopt and incorporate all prior paragraphs, as though fully set forth herein.

138. Defendants knew or should have known of the risk of fire and explosion at the Rockton Plant.

139. Defendants knew or should have known of the risk that pressurized hot oil could leak from the hot oil piping system and kettles at the Rockton Plant and ignite to cause a fire.

140. Defendants knew or should have known of the risk that a fire and explosion at the Rockton Plant would result in the release of toxic and harmful dust, particulate matter, smoke, debris and pollutants into the surrounding neighborhood.

141. The fire and explosions at the Rockton Plant caused the uncontrolled discharge of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants, which invaded the Plaintiffs' and the other Class Members' properties, and Plaintiffs and the other Class Members did not consent to the entry of such materials onto their properties.

142. Defendants knew or should have known that they caused the disposal and invasion of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants on the Plaintiffs' and the other Class Members' properties but have failed to remove such material from the Plaintiffs' and the other Class Members' properties.

143. Defendants' uncontrolled discharge of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants and the disposal and invasion thereof onto the Plaintiffs' and the other Class Members' properties is unreasonable and unlawful.

144. The discharge, disposal, and invasion of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants onto Plaintiffs' and the other Class Members' properties have substantially interfered with the lawful rights of Plaintiffs and the other Class Members to use and enjoy their properties, which constitutes a private nuisance.

145. The nuisance described above continues to this day and has adversely impacted the lives of Plaintiffs and the other Class Members.

146. The nuisance described above has unreasonably, negligently, and recklessly interfered with Plaintiffs' and Class Members' comfortable use and enjoyment of life and property, has diminished Plaintiffs' and the Class Members property values, and has thereby created a

common law nuisance, for reasons of which Defendants are liable to the Plaintiffs and the other members of the Class Plaintiffs represent.

147. As a direct and proximate result of this nuisance, Plaintiffs and the other Class Members suffered unacceptable and unreasonable interference with their rights to use and enjoy their properties, interference they should not be required to suffer without compensation.

148. As a direct and proximate cause of the nuisance, Plaintiffs and the other Class Members have incurred, and will continue to incur, monetary damages arising from the lost use and enjoyment of their property caused by Defendants' conduct.

**COUNT IV**
**Trespass**
**(Against Chemtool and Lubrizol)**

149. Plaintiffs adopt and incorporate all prior paragraphs, as though fully set forth herein.

150. Defendants knew or should have known of the risk of fire and explosion at the Rockton Plant.

151. Defendants knew or should have known of the risk that pressurized hot oil could leak from the hot oil piping system and kettles at the Rockton Plant and ignite to cause a fire.

152. Defendants knew or should have known of the risk that a fire and explosion at the Rockton Plant would result in the release of toxic and harmful dust, particulate matter, smoke, debris and pollutants into the surrounding neighborhood.

153. Defendants knew or should have known that the release of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants into the surrounding neighborhood would pose a risk of serious damage to, diminution in the value of, and loss of use and enjoyment of the affected property.

154. The fire and explosions at the Rockton Plant caused the uncontrolled discharge of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants, which invaded the property in which Plaintiffs and the other Class Members have an interest, and Plaintiffs and the other Class Members did not consent to the entry of such materials onto these properties.

155. Defendants are aware that they caused the disposal and invasion of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants on the Plaintiffs' and the Class Members' properties but have failed to remove the toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants from the properties.

156. Defendants' uncontrolled discharge of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants and the disposal and invasion thereof onto the Plaintiffs' and the other Class Members' properties is unreasonable and unlawful, and such discharge, disposal and invasion have substantially interfered with the lawful rights of Plaintiffs and the other Class Members to use and enjoy their properties, constituting an unlawful trespass.

157. The trespass is continuing and ongoing.

158. Defendants' interference with Plaintiffs' and Class Members' possessory rights was unreasonable and foreseeable.

159. As a direct and proximate result of the trespass, Plaintiffs and Class Members sustained and will continue to sustain a loss of ability to use and enjoy their properties.

160. As a direct and proximate cause of the trespass, Plaintiffs have incurred, and will continue to incur, monetary damages arising from the lost use and enjoyment of their property caused by Defendants' conduct.

**COUNT V**
**Trespass to Chattels**
**(Against Chemtool and Lubrizol)**

161. Plaintiffs adopt and incorporate all prior paragraphs, as though fully set forth herein.

162. Defendants knew or should have known of the risk of fire and explosion at the Rockton Plant.

163. Defendants knew or should have known of the risk that pressurized hot oil could leak from the hot oil piping system and kettles at the Rockton Plant and ignite to cause a fire.

164. Defendants knew or should have known of the risk that a fire and explosion at the Rockton Plant would result in the release of toxic and harmful dust, particulate matter, smoke, debris and pollutants into the surrounding neighborhood.

165. Defendants knew or should have known that the release of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants would pose a risk of serious damage to, diminution in the value of, and loss of use and enjoyment of the affected property.

166. The explosions and fire at the Rockton Plant caused the uncontrolled discharge of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants, which invaded the property in which the Plaintiffs and the other Class Members have an interest, dispossessing and intermeddling them of a chattel.

167. Plaintiffs and the other Class Members did not consent to the entry of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants onto their properties.

168. Defendants are aware that they caused the disposal and invasion of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants on the Plaintiffs' and the other Class Members' properties, dispossessing and intermeddling them of a chattel, but have failed to remove the smoke and particles from the properties.

169. Defendants' uncontrolled discharge of toxic and harmful substances, smoke, debris, particulate matter, other dust, and/or other pollutants and the disposal and invasion thereof onto the Plaintiffs' and the other Class Members' properties is unreasonable and unlawful and has substantially interfered with the lawful rights of Plaintiffs and the other Class Members to use and enjoy their properties.

170. The trespass is continuing and ongoing.

171. Defendants' interference with Plaintiffs' and the other Class Members' possessory rights was unreasonable and foreseeable.

172. As a direct and proximate result of the trespass, Plaintiffs and the other Class Members sustained and will continue to sustain a loss of ability to use and enjoy their properties.

173. As a direct and proximate result of the trespass, Plaintiffs and the other Class Members have incurred, and will continue to incur, monetary damages arising from the lost use and enjoyment of their property caused by Defendants' conduct.

## I. REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class Members, respectfully request that this Court:

(a) Issue an order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23 in the manner described above;

(b) Appoint Plaintiffs Mackey, Migliore, and Henderson as Class representatives and their undersigned counsel as Class counsel;

(c) Issue a class-wide judgment holding Defendants liable for the reasons described above for their unlawful conduct causing Plaintiffs and the other Class Members to sustain damages resulting therefrom;

(d) Enter a judgment declaring that Defendants have committed the violations of law alleged herein;

(e) Award Plaintiffs and the other Class Members compensatory damages in an amount that is fair, just, and reasonable, to be determined at trial;

(f) Award Plaintiffs and the other Class Members punitive damages against Defendants in an amount to be determined at trial;

(g) Award pre-judgment and post-judgment interest to Plaintiffs and the other Class Members as permitted by law;

(h) Award reasonable attorneys' fees;

(i) Award costs of suit, including expert witness fees, to the Plaintiffs and proposed Classes pursuant to Federal Rule of Civil Procedure 54(d); and

(j) Order equitable, injunctive, and declaratory relief requiring Defendants to:

(1) Provide all Class Members with particulate masks;

(2) Provide all Class Members with high efficiency particulate air filters for their homes;

(3) Conduct immediate testing and sampling of the air and groundwater to detect the presence of toxins and other chemicals potentially hazardous to human health;

(4) Immediately and publicly disclose all information regarding the toxins and other compounds that comprised the plume;

(5) Institute perimeter particulate matter monitoring at the fence line of the Rockton Plant;

(6) Install additional air quality monitors in all affected areas;

(7) Provide a full cleanup of all affected residences, businesses, and common areas;

(8) Wash the exterior of buildings in all affected areas;

(9) Wash the streets and sidewalks in all affected areas;

(10) Provide alternative housing for Class Members for the duration of the cleanup process;

(11) Provide funds for an independent third-party assessor to evaluate and provide estimates to class member property owners regarding property damage and diminution in property value; and

(12) Grant any and all additional relief that the Court deems just and proper.

## J. JURY DEMAND

Plaintiffs, individually and on behalf of the other proposed Class Members, demand a trial by jury on all issues herein so triable pursuant to Federal Rule of Civil Procedure 38.

Dated: July 21, 2023

Respectfully submitted,

/s/ Robert S. Libman
Robert S. Libman
One of the Attorneys for Plaintiffs

Robert S. Libman
rlibman@lawmbg.com
Benjamin J. Blustein
bblustein@lawmbg.com
Scott A. Entin
sentin@lawmbg.com
Deanna N. Pihos
dpihos@lawmbg.com
Roisin Duffy-Gideon
rduffy@lawmbg.com
Angelys Torres McBride
atorres@lawmbg.com
Miner, Barnhill & Galland, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
312.751.1170

Sarah E. Siskind
ssiskind@lawmbg.com
Miner, Barnhill & Galland, P.C.
44 E. Mifflin St., Ste. 803
Madison, WI 53703
608.255.5200

Edward J. Manzke
ejmanzke@collinslaw.com
Shawn Collins
shawn@collinslaw.com
Margaret E. Galka
mgalka@collinslaw.com
The Collins Law Firm, PC
1770 Park St., Ste. 200
Naperville, IL 60563
630.527.1595

Daniel R. Flynn
dflynn@dicellolevitt.com
Anna C. Skinner (*pro hac vice*)
askinner@dicellolevitt.com
DiCello Levitt Gutzler LLC
Ten North Dearborn St.
Chicago, IL 60602
312.214.7900

Robert M. Foote
rmf@fmcolaw.com
Foote, Mielke, Chavez & O'Neil LLC
Ten W. State St., Ste. 200
Geneva, IL 60134
630.232.7450

Steven A. Hart
shart@hmelegal.com
Charles R. Vogt
cvogt@hmelegal.com
Hart McLaughlin & Eldridge, LLC
One S. Dearborn, Ste. 1400
Chicago, IL 60603
312.985.9389

David A. Neiman
dneiman@rblaw.net
Romanucci & Blandin, LLC

321 N. Clark St., Ste. 900
Chicago, IL 60654
312.458.1000

John James Holevas
jholevas@wilmac.com
Marc Gravino
mgravino@wilmac.com
WilliamsMcCarthy
120 W. State St.
Rockford, IL 61105-0219
815.987.8500